IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| THE TRAVELERS HOME AND MARINE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>GARY SMITHERMAN and S.L., as parent and next-of-friend of minor child S.G.,<br><br>    Defendants. | CASE NO. 2:19-CV-540-WKW<br>[WO] |

## **MEMORANDUM OPINION AND ORDER**

Before the court is Plaintiff's motion for summary judgment (Doc. # 44) and Defendant Gary Smitherman's cross-motion for summary judgment (Doc. # 47). For the reasons stated below, Plaintiff's motion is due to be granted and Smitherman's motion is due to be denied.

### I. JURISDICTION AND VENUE

Subject matter jurisdiction is proper under 28 U.S.C. § 1332. The parties do not contest personal jurisdiction or venue.

### II. BACKGROUND

This action asks whether Plaintiff, an insurance company, is required to indemnify and defend Defendant Gary Smitherman in an action against him in an Alabama state court under the terms of Smitherman's insurance policy. During the

relevant timeframe, Smitherman's homeowner's insurance policy contained the following coverage:

> **COVERAGE E – PERSONAL LIABILITY**
>
> If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:
>
> 1. Pay up to our limit of liability for the damages for which an "insured" is legally liable. Damages include prejudgment interest awarded against an "insured"; and
>
> 2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle and defend ends when our limit of liability for the "occurrence" is exhausted by the payment of a judgment or settlement.

(Doc. # 45-7 at 30.) "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results during the policy period, in 'bodily injury' or 'property damage.'" (Doc. # 45-7 at 16.) The policy contains multiple exclusions, of which the following two are relevant:

> **A.   Coverage E – Personal Liability and Coverage F – Medical Payments to Others.**
>
> Coverages E and F do not apply to "bodily injury" or "property damage":
>
> 1. Which is expected or intended by an "insured" even if the resulting "bodily injury" or "property damage":

    a. Is of a different kind, quality or degree than initially expected or intended; or

    b. Is sustained by a different person, entity, real or personal property, than initially expected or intended.

 . . .

  7. Arising out of sexual molestation, corporal punishment or physical or mental abuse.

 . . .

(Doc. # 45-7 at 32.)

 Smitherman seeks indemnity and defense for a particular action in Alabama state court: *S.G., by and through her mother and next-of-friend S.L. v. Smitherman et al.*, Case No. CV-2019-900093, in the Circuit Court of Chilton County, Alabama ("the Underlying Litigation"). That action is a civil lawsuit pertaining to Smitherman's 2016–17 interactions with S.G.

 In 2016, Smitherman, a fifty-eight-year-old male, was the youth director at Friendship Baptist Church. (Doc. # 47-4 at 2–3.) In that position, Smitherman planned and hosted events for minor children who were members of the Friendship Baptist Church Youth Ministry. (Doc. # 47-4 at 3.) Many events were offered at Smitherman's home, including personal tutoring services for minor children. (Doc. # 47-4 at 3.)

 S.G., a female who was eleven years old at the time of all relevant events, met Smitherman in his capacity as youth director at Friendship Baptist Church. (Doc. #

3

45-3 at 81.)  S.G. attended pool parties and other events at Smitherman's home. (Doc. # 45-3 at 85–86.)  When Smitherman heard that S.G.'s parents had divorced, Smitherman arranged for S.G.'s family to live in an apartment he owned.  (Doc. # 45-3 at 174.)

In September 2016, Smitherman began "tutoring" S.G. and two other children at Smitherman's home.  (Doc. # 45-3 at 290.)  All three children were from S.G.'s household.  (Doc. # 45-3 at 83.)  Smitherman would pick the children up from school and take them to his house.  (Doc. # 45-3 at 92.)  The children would study on their own, occasionally asking Smitherman or his wife for help.  (Doc. # 45-3 at 118.)

Smitherman cultivated a close relationship with the children, often letting them stay long to play with beads, make bracelets, or other activities.  (Doc. # 45-3 at 87–88.)  After about nine weeks, Smitherman stopped tutoring the male child and only invited the two female children to his house.  (Doc. # 45-3 at 290.)  The two female children began to occasionally spend the night at Smitherman's house. Eventually, S.G. became the sole target.  While S.G. was distracted, Smitherman would take only the other female child home, even though S.G. and the other child lived in the same household.  (Doc. # 45-3 at 88.)  When Smitherman returned, S.G. would ask to go home as well, but Smitherman would tell her that it was too late and that she would have to stay at Smitherman's house.  (Doc. # 45-3 at 89.)

4

S.G. stayed at Smitherman's house several nights each week during this period, often only going home on the weekends. (Doc. # 45-3 at 89.) Smitherman bought S.G. clothes, and S.G. kept these clothes and some from her mom at Smitherman's house. (Doc. # 45-3 at 93.) Smitherman bought S.G. a puppy and a tablet device. (Doc. # 45-3 at 89–90.) For Christmas 2016, Smitherman bought S.G. Christmas presents and told S.L., S.G.'s mother, that S.L. should use the December rent money to buy S.G. presents instead of paying rent to Smitherman. (Doc. # 45-3 at 179.)

S.G. expressed a desire to spend less time at Smitherman's house, but Smitherman told S.G. that he would take away all the presents he had given her and he would hurt the puppy he had given her. (Doc. # 45-3 at 180.) When S.G. told S.L. about her desire to spend less time at Smitherman's house, S.L. called Smitherman, who told S.L. that S.G. needed the tutoring and that S.G. would fail her classes if she did not come to Smitherman's house. (Doc. # 45-3 at 181.)

Smitherman's wife was involved in the tutoring at first. (Doc. # 45-3 at 94.) When S.G. began spending a significant amount of time at Smitherman's house, Smitherman and his wife began fighting. (Doc. # 45-3 at 96.) When threatened with divorce, Smitherman said that he and his wife "were just going to get a divorce because [Smitherman] promised [S.G.] that he loved her and was going to be here for her, and if [Smitherman's wife] couldn't understand that, then she can go." (Doc.

5

# 45-3 at 178.) Smitherman's wife began sleeping in the detached pool house, while Smitherman and S.G. slept in the main house. (Doc. # 45-3 at 95–96.) Smitherman would sleep downstairs, and S.G. would sleep upstairs. (Doc. # 45-3 at 95.)

One night in early February 2017, after S.G. had gone to bed, Smitherman went upstairs, laid down next to S.G. in her bed, and sexually assaulted S.G. by groping her breasts and groin and by digital penetration. (Doc. # 45-3 at 97–101.) Smitherman threatened to hurt S.G.'s family if she told anyone about the assault. (Doc. # 45-3 at 204.)

Some days later, S.G. told her grandmother about the incident, who notified S.L. (Doc. # 45-3 at 103.) S.L. brought S.G. to meet with Smitherman and Smitherman's wife. (Doc. # 45-3 at 103–104.) Smitherman insisted that S.G.'s grandmother had "brainwashed" S.G., but S.L. decided to bring S.G. to a medical examination. (Doc. # 45-3 at 186–87.) Smitherman offered to pay for the medical examination, but S.L. rejected the offer. (Doc. # 45-3 at 215.) S.L. contacted the police. (Doc. # 45-3 at 211.)

In August 2018, Smitherman was found guilty of sexual abuse of a child under the age of twelve. (Doc. # 45-5 at 2.) At trial, an expert witness testified regarding the typical child abuse process, saying that it may begin with a grooming period. (Doc. # 45-3 at 273.) Grooming typically involves building a relationship of trust with the child and possibly the child's parents, spending a significant amount of time

with the child, and giving gifts to the child. (Doc. # 45-3 at 272–73.) The expert testified that, after the abuse, abusers frequently threaten their victims in order to keep them from disclosing the abuse to parents or others. (Doc. # 45-3 at 271–72.)

On April 30, 2019, S.L., acting on behalf of her daughter S.G., filed suit against Smitherman in the Underlying Litigation. (Doc. # 47-3 at 17.) S.L. filed an amended complaint—now the operative pleading—on December 16, 2019. (Doc. # 47-3 at 19.) S.L.'s amended complaint brings several claims against Smitherman, Friendship Baptist Church, and the pastor of Friendship Baptist Church. (Doc. # 47-4 at 2.) Eight of the counts are specifically brought against Smitherman.

Count I, for infliction of emotional distress, alleges that Smitherman "negligently and/or wantonly inflicted emotional distress upon the Plaintiff when he perpetrated sexual acts, including grooming, on S.G." and that:

> Smitherman also negligently or wantonly and recklessly inflicted emotional distress upon S.G. by, among other things, threatening to harm her pets and family members if she did not continue tutoring at his home and staying at her home, which he said was necessary to avoid distractions in connection with the tutoring. Defendant Smitherman also negligently or wantonly and recklessly inflicted emotional distress upon S.G. by conducting tutoring and providing housing in an unhealthy environment, including one in which he and his wife fought verbally and physically in the presence of S.G.

(Doc. # 47-4 at 4.)

Count II, for invasion of privacy, alleges that:

> Smitherman intruded into S.G.'s physical solitude or seclusion by persuading her family to allow S.G. to be tutored, stay the night and in

7

general remain in his presence. Defendant Smitherman also intruded into S.G.'s physical solitude or seclusion by negligently and/or wantonly and recklessly providing housing for her in a room he also occupied with his wife, by subjecting her to verbal and physical fights between him and his wife, and by causing her to remain in this unhealthy environment through the negligent use of threats, as aforesaid.

(Doc. # 47-4 at 5.)

Count III, for assault and battery, alleges that "Smitherman did negligently and/or wantonly commit assault and battery upon the Plaintiff when he perpetrated sexual acts on her." Count III also mentions that "Smitherman engaged in conduct including but not limited to threats of violence against pets and family members of S.G., as well as fighting and acts of violence against his then wife in the presence of S.G." (Doc. # 47-4 at 6.)

Count IV, for false imprisonment, alleges that:

Smitherman did negligently and/or wantonly falsely imprison S.G. when he perpetrated sexual acts on her. He also negligently or wantonly and recklessly falsely imprisoned S.G. by threatening to harm her pets and family members as a way to persuade her to continue to engage in tutoring at his home and to remain overnight in his home. . . . Defendant Gary Smitherman further threatened the minor child and her family should if she refused to continue to visit and/or tell others about the sexual abuse that forms the basis of this action.

(Doc. # 47-4 at 6.)

Count V, for "negligence or wantonness and recklessness," alleges that:

48.   Defendant Gary Smitherman owed a duty of reasonable care in his acts and behavior around minor children, including in the provision of tutoring services. The duty to provide tutoring in a reasonable and

8

careful manner arose from Defendant Smitherman's having undertaken in connection with his role with the Church and as part of his Church activities to provide tutoring to S.G.

49. Defendant Gary Smitherman breached that duty when he acted in a negligent and/or wanton and reckless manner in his provision of tutoring in an unhealthy environment as aforesaid, through the use of threats, as aforesaid, to persuade S.G. to receive the tutoring in an unhealthy environment, and through the provision of shelter that subjected S.G. to living in a room with Defendant Smitherman and his wife and being exposed to their fighting. This Count of the Complaint does not allege as against Defendant Smitherman any acts of sexual abuse, but rather is limited to the negligent and/or wanton and reckless tutoring he provided.

50. As a direct and proximate result of Defendant Smitherman's negligent and/or wanton and reckless tutoring, as aforesaid, S.G. was caused to suffer emotional distress independently of the sexual acts perpetrated upon her, including from the fear she was caused to endure from threats, from the fighting to which she was exposed, and from being denied the companionship of her mother, grandmother, and other family. She was also caused to endure less effective tutoring than she might otherwise to receive [*sic.*] and not to do as well in school as she might otherwise have done had she received tutoring provided through the exercise of reasonable care. Defendant Smitherman's said negligence and/or wantonness also caused Plaintiff to be financially damaged as aforesaid.

(Doc. # 47-4 at 8.)

Count VII, for outrage, alleges that "Smitherman did commit the tort of outrage when he perpetrated sexual acts, including grooming, on S.G. over a period of time." (Doc. # 47-4 at 9.) Count VII alleges that "Smitherman also committed the tort of outrage when he made threats of violence against S.G.'s pets and family and friends." (Doc. # 47-4 at 10.)

9

Count VIII, for breach of fiduciary duty, alleges that "a fiduciary relationship existed between Defendant Gary Smitherman and S.G, and Defendant Smitherman had a duty to act toward S.G. consistent with his fiduciary relationship." (Doc. # 47-4 at 10.) The count continues on to say that "Smitherman breached that duty by sexually abusing, including grooming, S.G. over a period of time and by negligently or wantonly and recklessly tutoring her, as aforesaid." (Doc. # 47-4 at 11.)

Count XII, for fraud and fraudulent misrepresentation, alleges that "Smitherman [and church officials] fraudulently misrepresented material facts concerning the safety of children and the church's responsibilities for children," that "Smitherman [and church officials] fraudulently misrepresented material facts concerning Gary Smitherman's abilities and certifications as a tutor," and that "Smitherman [and church officials] fraudulently misrepresented to the public in word and deed, that Defendant Gary Smitherman was Godlike, sexually safe, moral and thus would not be sexually dangerous to minors." (Doc. # 47-4 at 17.)

Plaintiff declined to indemnify or defend Smitherman in the Underlying Litigation and brought this suit on July 29, 2019, seeking a judgment declaring that Plaintiff has no duty to defend or indemnify Smitherman. (Doc. # 1 at 14.) Plaintiff has since filed an amended petition for declaratory judgment (Doc. # 26), which Smitherman has answered with counterclaims for declaratory judgment, bad faith, and breach of contract. (Doc. # 27.) Plaintiff and Smitherman have now filed cross-

10

motions for summary judgment, each claiming that they are entitled to judgment as a matter of law.

## III. STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.* Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to

11

the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

"Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Bricklayers Local Union No. 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975).[1] "Nonetheless, cross-motions may be probative of the non-existence of a factual dispute when, as here, they demonstrate a basic agreement concerning what legal theories and material facts are dispositive." *Id.* "[W]hen both parties proceed on the same legal theor[ies] and rely on the same material facts[,] the court is signaled that the case is ripe for summary judgment." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983). But "before the court can consider the legal issues raised by the parties on cross-motions for summary judgment, it must have no doubt as to the relevant facts

---

[1] The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

that are beyond dispute." *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984).

### IV.  DISCUSSION

In situations such as these, where a lawsuit is brought against the insured for claims that are clearly excluded from coverage, as well as related claims that are not so clearly excluded, the court must look to the gravamen of the complaint. *Auto-Owners Ins. Co. v. Am. Cent. Ins. Co.*, 739 So. 2d 1078, 1082 (Ala. 1999).  Where all the allegations of the complaint "arise out of" the same course of conduct or are "related and interdependent," then those claims are "not severable," and the insurance company is not obligated "to provide a defense and indemnity as to some claims but not as to others." *Id.*

The amended complaint in the Underlying Litigation brings claims based on Smitherman's actions throughout the grooming process.  It brings claims based on his misrepresentation of his ability to tutor; his misrepresentation of the safety of children in his care; his failure to tutor; his threats to keep S.G. from leaving his tutelage; his persuading S.G.'s family to keep S.G. under his tutelage; the grooming as a whole; the sexual assault itself; and, lastly, the threats to keep S.G. from disclosing the abuse. (Doc. # 47-4.) None of these acts can be fairly separated from the backdrop of the grooming process.  The tutoring, as alleged in the amended complaint and as established at Smitherman's trial, was a front to gain access to

13

children. Smitherman's misrepresentation of his tutoring abilities and failure to properly tutor were necessary steps to achieve access to children such as S.G. Fighting in front of S.G. was obviously not a necessary step in Smitherman's grooming process, but "exposing" S.G. to the fighting was inherent in keeping S.G. at Smitherman's house. Further, there is significant—and uncontested—evidence in the trial transcript that the fighting itself was over whether S.G. should be allowed to spend so much time at Smitherman's house.

In *Cotton States Mutual Insurance Company v. Daniel*, this court was faced with a similar question regarding insurance coverage. No. 3:07-CV-843-WKW, 2008 WL 4999097, at *5 (M.D. Ala. Nov. 20, 2008) (Watkins, J.). In *Daniel*, the child molester had traded prescription drugs for sexual favors. *Id.* While the state court complaint against the child molester in *Daniel* brought at least one claim that related solely to the illegal furnishing of drugs, those allegations could not "be read in a vacuum." *Id.* This court held that the insurance coverage did not extend to those acts lingering on the periphery of the grooming and sexual abuse so long as the grooming and sexual abuse is a necessary part of the story of the other acts. *Id.* ("[E]ach claim is built on the premise that [the defendant] sexually molested and abused the minor.").

The focus in this inquiry is "on the factual allegations in the complaint, not on the legal theories asserted." *Id.* Considering the uncontested evidence in this case,

it is clear that all the allegations in the Underlying Litigation are premised on a single course of conduct undertaken by Smitherman with the primary goal of grooming and sexually assaulting S.G. The claims in the Underlying Litigation thus, for the same reasons stated in *Daniel*, fall under the exclusions in the insurance policy, and Plaintiff is entitled to judgment as a matter of law.

## V.  CONCLUSION

It is therefore ORDERED that Plaintiff's motion for summary judgment (Doc. # 44) is GRANTED as to all claims and counterclaims, and that Defendant Smitherman's motion for summary judgment (Doc. # 47) is DENIED.

Final judgment will be entered separately.

DONE this 22nd day of December, 2021.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE